UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case Number 18-cr-00470-PAB-10

UNITED STATES OF AMERICA,

    Plaintiff,

v.

10.    AIDE PAOLA TARANGO,

    Defendant.

## PLEA AGREEMENT

THE UNITED STATES OF AMERICA, JASON R. DUNN, UNITED STATES ATTORNEY, by Stephanie Podolak, Assistant United States Attorney, and the defendant AIDE PAOLA TARANGO personally and by her attorney Alaurice Tafoya-Modi, Esq., submit the following Plea Agreement and Stipulation of Facts pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure and District Court of Colorado Local Rule 11.1.

## PLEA AGREEMENT

**A.**    **Count of Conviction:**

    1.    The defendant will plead guilty to Count 1 of the Indictment which charges that on or about and between March 1, 2017, and April 1, 2018, both dates being approximate and inclusive, within the State and District of Colorado and elsewhere, the defendant AIDE PAOLA TARANGO and others, did knowingly and intentionally conspire to distribute, or possess with the intent to distribute, 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II

1

COURT EXHIBIT
1

Controlled Substance. All in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii)(II), and 846.

**B.** **Government's Agreements:**

2. In consideration of this plea, the government, at the time of sentencing, agrees to dismiss all remaining counts of the above-captioned Indictment with prejudice as to defendant AIDE PAOLA TARANGO only.

3. In further consideration of this plea, the government agrees to file a motion requesting that the defendant receive a 3-level decrease for acceptance of responsibility pursuant to § 3E1.1(b).

**C.** **The Defendant's Agreements and Appellate Waiver:**

4. The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction, (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 27 or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

5. The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not

prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

## ELEMENTS OF THE OFFENSE

6. To sustain a conviction for violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii)(II), and 846, the Government must prove each of the following elements beyond a reasonable doubt:

   a. First: two or more persons agreed to violate the federal drug laws;

   b. Second: the defendant knew the essential objective of the conspiracy;

   c. Third: the defendant knowingly and voluntarily involved himself in the conspiracy;

   d. Fourth: there was interdependence among the members of the conspiracy; and

   e. Fifth: the overall scope of the conspiracy involved 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance.

## STATUTORY PENALTIES

7. The above-described offense in the Information carries the following statutory penalties:

   (a) Maximum term of imprisonment: Not more than Life;

   (b) Minimum term of imprisonment: Not less than 10 years;

   (c) Supervised release term: At least 5 years;

   (d) Maximum fine: Not more than $10,000,000;

3

    (e) $100 mandatory victim's fund assessment fee;

    (f) Restitution: None.

  8. The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury. If the defendant is an alien, the conviction may cause the defendant to be deported; denied admission to the United States in the future, and denied citizenship.

## STIPULATION OF FACTUAL BASIS

  9. The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in Title 18, United States Code, Section 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

  10. This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computation, to other Title 18, United States Code, Section 3553 factors, or to the Court's overall sentencing decision.

### A. Background of Investigation and Identification of the Eduardo Ramon Tarango-Tarango DTO

  11. The government would prove the following facts at trial. In January 2015, the Northern Colorado Drug Task Force ("NCDTF") initiated a wiretap investigation into a cocaine trafficking organization referred to as the Acosta DTO. Investigators believed

4

Omar Chavez-Gutierrez was the head of the Acosta DTO. However, Chavez-Gutierrez was incarcerated between March 2015 and June 2015 and was not intercepted during or charged as part of the Acosta investigation.

12. In March 2017, members of the Denver OCDETF Strike Force Group ("SFG") started a new investigation into two independent but connected cocaine trafficking organizations. The first DTO was led by Colorado cell-head Omar Chavez-Gutierrez and sourced by Mexico-based co-defendant Jose Rodolfo-Pena. The second was directed by Mexico-based source of supply Eduardo Ramon Tarango-Tarango, a.k.a. "Conejo," with assistance from Colorado-based cell-heads Jose Valenzuela-Vargas and Armando Colacion-Talamantes.

13. Phone records and wiretap data shows the two organizations used common sources of supply, shared distributors, and maintained an overlapping customer-base. Both DTOs obtained cocaine from multiple sources in Chihuahua, Mexico. The cocaine was crossed at the U.S./Mexico border between Juarez and El Paso. Multi-kilogram shipments were transported by couriers to Colorado where the cocaine was delivered to distributors in the Denver metro area and then sold to lower-level dealers. Bulk cash drug proceeds were hidden in courier vehicles and transported to sources of supply in Mexico.

14. The following law enforcement techniques were used during the investigation: physical surveillance; search of public records; telephone data: pen registers/trap & trace; search warrants to authorize trackers on telephones and vehicles GPS technology; grand jury and administrative subpoenas to obtain bank records, telephone records, property records; approximately 25 wiretaps on individual telephone

numbers; numerous wiretap continuation orders; covert cameras and interviews with co-conspirators and drug couriers.

B. **Evidence Supporting the Count of Conviction**

15. On February 5, 2018, the Honorable Robert E. Blackburn authorized the initial interception of wire and electronic communications occurring to and from: (1) telephone number (720) 651-7609, and (2) telephone number (303) 507-0761, both telephones in the possession of and being used by Aide Paola Tarango ("Target Telephone Twenty-Three" and "Target Telephone Twenty-Four").

16. Wiretap communications showed that AIDE PAOLA TARANGO (hereinafter "TARANGO"), the niece of source-of-supply Eduardo Tarango-Tarango, obtained multi-kilograms of cocaine from DTO members in Colorado and then sold the kilograms predominately to her boyfriend identified as co-defendant Jason Oaks. TARANGO communicated directly with Tarango-Tarango and met and communicated with significant Colorado-based DTO distributors including co-defendant Oliver Salazar-Felix and Omar Chavez-Gutierrez. Evidence supporting these conclusions is as follows.

(1) <u>Tarango Purchases One Kilogram of Cocaine on February 7, 2019</u>

17. On February 7, 2018, at 2:29 p.m., (Call #80) AIDE PAOLA TARANGO, on TT-23, received an incoming call from Oliver Salazar-Felix using telephone number (720) 586-9020. During the conversation, Salazar-Felix advised the courier transporting the cocaine should be at Salazar-Felix's house at 5:00 p.m., and PAOLA TARANGO ordered one kilogram of cocaine. The call was as follows.

| | |
|---|---|
| Salazar: | "The guy said he would call at around 4:00 so you should come at five and we will meet then." |
| Tarango: | "For you to give me one." |

6

18. Starting at 2:31 p.m., TARANGO, on TT-23, engaged in a text message conversation with Eduardo Tarango-Tarango who said the cocaine was on its way and should arrive in Denver at 4:00 p.m. At 2:32 p.m., TARANGO and Tarango-Tarango spoke on the telephone (Call #87) and Tarango-Tarango explained he was charging $25,000 per kilogram because the kilogram was high quality. The conversation was as follows.

| | |
|---|---|
| P. Tarango: | "How is it . . . Is it a sure thing?" |
| E. Tarango: | "They are really bad ass." |
| P. Tarango: | "If not, it's a no go . . . Will it be the same? |
| E. Tarango: | "2-5." |

19. Later that afternoon, at 4:25 p.m., (Call #104) TARANGO placed a call on TT-23 to DTO distributor and co-defendant Salazar-Felix using telephone number (720) 586-9020. Salazar-Felix advised the courier was delayed but he would be ready to distribute the cocaine at 6:30 p.m., and the distribution would occur at Salazar-Felix's house. The conversation, was as follows.

| | |
|---|---|
| Salazar: | "I talked to the guy and the plan's changed . . . The food will be ready in 2 ½ hours . . . He first said on the ½ hour . . . Then they were going to start serving at 4:00 but changed his mind . . . And we're going to serve at around 6:30." |
| Tarango: | "Alright then" |
| Salazar: | "For sure . . . Everything is fine . . . I will see you then. You already know where . . . Don't park by the house. Park by the same but further up." |

7

20. On February 7, 2018, at 4:21 p.m., surveillance was established at Salazar-Felix's residence located at 1620 Orchard Drive, Adams County, Colorado. At 6:01 p.m., TARANGO, from TT-23 (Call #109) called her boyfriend co-defendant Jason Oaks and asked "are you ready to go? You have everything?" This communication, coupled with later calls and surveillance, showed that Oaks also intended to obtain cocaine. At 6:22 p.m., TARANGO using TT-23 spoke with Salazar-Felix who instructed "come over here because he will be here soon and you'll be here around the same time."

21. At 6:57 p.m. surveillance followed Salazar-Felix from his residence to a parking lot between a Walgreens and a liquor store on West 84th Avenue. Surveillance then saw a 2014 white, Ford F-150 bearing Texas License Plate JYK0056, begin to follow the Hyundai. The vehicle is registered to DTO courier and co-defendant Salomon Barrios-Garcia, 611 Yarbrough Apartment 727, El Paso, Texas. The two vehicles drove to Salazar-Felix's residence and both men went inside.

22. Starting at 7:27 p.m., (Call #124) Salazar-Felix and TARANGO engaged in a text message conversation during which Salazar-Felix advised the courier was already at Salazar-Felix's house with the drugs. TARANGO confirmed she would come by and pick up the cocaine. Salazar-Felix told TARANGO to drive past the house and call rather than park in front of his house. The communications were as follows.

| | |
|---|---|
| Salazar | "It's already here . . . Let me know . . . If not to tell him tomorrow." |
| Tarango: | "Is the driver there with you?" |
| Salazar: | "I asked you to come a long time ago so you would arrive more or less . . ." |

| | | |
|---|---|---|
| | Tarango: | "Do you have them in your house?" |
| | Salazar: | "The banquet is served." |
| | Tarango: | "I will be there to have dinner with you guys. |
| | Salazar: | "Go further up and call me." |

(2) <u>February 14, 2018 Cocaine Transaction</u>

23. On February 13, 2018, at 8:07 p.m., TARANGO received an incoming SMS message (Call #419) on TT-23 from Salazar-Felix using (720) 586-9020. The message stated "It looks like the man is coming so you can get ready for the dance." A second message was received immediately after that stated "I was just notified" followed by a third message that said "the kind of music your (male) friend likes."

24. On February 13, 2018, at 8:42 p.m., TARANGO placed an outgoing call (Call #1297) on TT-24 to Salazar-Felix who advised that a cocaine shipment would be leaving the Juarez or El Paso area the next day and the courier would be the same person who delivered cocaine to Salazar-Felix on February 7, 2018. The conversation was as follows.

| | | |
|---|---|---|
| | Salazar: | "Did you received the message in the other phone?" |
| | Tarango: | "I just saw them. When?" |
| | Salazar: | "Well I think the one who called me was your relative and he told me to let you know. I believe that tomorrow in the morning they'll leave. " |
| | Tarango: | "Oh, really? I though it happened already." |
| | Salazar: | "I think that in the evening but I'll let you know right away. Now I am fixing the other one the ones that are pending. And well, just for you to be ready . . . for you to tell your friend . . . he told me that it was the same model of the car from last time." |

9

25. On February 14, 2018, around 8:00 p.m., the data from the GPS tracker affixed to the white F-150 indicated the vehicle traveled from Mexico to El Paso, where it remained overnight. On the morning of February 15, 2018, at 5:35 a.m., an LPR hit showed the vehicle traveled northbound through Dona Ana, New Mexico. The GPS tracker also showed the vehicle traveling northbound on I-25. Based on the intercepted calls and prior surveillance, investigators believed the vehicle was on its way to the Denver metro area to deliver cocaine. The GPS and LPR data showed the vehicle travelled across state lines in order to make the delivery.

26. Surveillance was established and, at approximately 1:45 p.m., investigators observed the F-150 traveling north on I-25. Investigators followed it towards Pueblo, Colorado. Pueblo Police Department Det. V. Petkosek was contacted and asked conduct a traffic stop on the vehicle if he found probable cause to do so. At approximately 2:18 p.m., Det. Petkosek stopped the vehicle at mile marker 94 and identified the driver as Salomon Barrios-Garcia. This was the same person previously seen on February 7, 2018 in connection with the cocaine delivery to Salazar-Felix.

27. A K-9 alerted to the odor of drugs emanating from the vehicle and Barrios-Garcia was visibly nervous. Barrios-Garcia gave consent to search and approximately 4.89 kilograms of cocaine was located in an aftermarket compartment behind the passenger airbag. A second GPS device also found hardwired into the vehicle and hidden under the dashboard. Barrios-Garcia refused to speak to law enforcement.

28. On February 17, 2018, at 2:48 p.m., TARANGO placed an outgoing call (Call #769) on TT-23 to Tarango-Tarango using Mexico based phone number (639) 117-6489. During the call, Tarango-Tarango talked about the stop of Barrios-Garcia and the cocaine's seizure. The conversation was as follows.

| | |
|---|---|
| Tarango: | "What's up cousin . . . well they fell through and shit, again." |
| P. Tarango: | "No way . . . When?" |
| Tarango: | "There in Pueblo and shit.  Since the day before yesterday." |
| P. Tarango: | "At the same place, again?" |
| Tarango: | "Since the day I let you know that.  At the same place." |
| P. Tarango: | "That is kind of weird, right?" |
| Tarango: | "Honestly, that is what I am thinking.  I told the guy, 'You know what, listen.' I said, 'I don't know what the fuck is going on.' I say, 'We need to get the fuck on it.' Poor guy, the screwed him big time . . . I was going to call you from a new device I'll call you in a bit for you to save it. And he told me, 'you know what, tell your cousin not to get upset.' He said, 'We are going to try harder.' There were four little cars . . . Everything is too weird . . . at the same place, cousin . . . I thought that this guy had told you. Didn't Oli tell you?" |
| P. Tarango: | "I just talked to him." |
| Tarango: | "And what did he say? "The horse stumbled again? Didn't he say that?" |
| P. Tarango: | "He said 'The horse didn't arrive' and I thought . . . things were just behind. That was why I got confused." |

11

| | |
|---|---|
| Tarango: | No, it all went to hell . . . The guy had lost about ten little cars . . . ten to fifteen." |
| P. Tarango: | "In the period of time that everything was calm?" |
| Tarango: | "Yes in that time . . . " |
| P. Tarango: | "But the ones in Pueblo was from the old lady right? For the mishap that the old lady had or was it also there the other time?" |
| Tarango: | "Yes . . . it was down there one of the times. it has been twice that they screw us in Pueblo and then the time with the tickets there as well . . . The guy told me 'Hey find someone to go on the bus with at least two' but I don't have anybody . . . He is preparing another car and he has more people but not until two week." |
| P. Tarango: | "That girl doesn't get interested . . . the aunt?" |
| Tarango: | "Well that is what I am trying to find out to see if she goes on the bus. For her to tape two to herself, do you understand?" |
| P. Tarango: | "She told me she had retired . . . That she wasn't coming." |
| Tarango: | "I am trying to figure things out . . . I spoke with another guy I believe he had there two. For you to grab one . . . To get the company working again . . . I am getting on it." |
| P. Tarango: | "But they also got me tied up." |
| Tarango: | "That guy doesn't get discouraged. That is what he tells me, 'I can't care less.' He says 'I'll try harder . . . Just don't abandon me' . . . If I abandon him, when he gets on his feet again, he is going to send me to hell. . . But let me call another guy, at least in case you want to grab one." |
| Tarango: | "Yeah, if it's like yours, if not. Don't even try it." |

(3) <u>March 1, 2018 to March 5, 2018 Cocaine Transaction</u>

29. Between March 1, 2018 and March 5, 2018, Eduardo Tarango-Tarango arranged for Salazar-Felix to distributed two kilograms of cocaine to TARANGO and Jason Oaks. The transaction took place on March 5, 2018. The evidence in support of these conclusions is explained below.

30. On March 1, 2018, at 3:58 p.m., TARANGO placed an outgoing call (Call #1105) on TT-23 to Tarango-Tarango using Mexico based phone number (639) 117-6489. Tarango-Tarango asked how TARANGO was doing and TARANGO replied she had been waiting. Tarango-Tarango advised that drugs were not available from the old source because of the past seizures. Tarango-Tarango added that he was trying to get cocaine and "take care of that" using a different source. Tarango-Tarango said he believed another drug shipment would arrive in Colorado during the week.

31. On March 3, 2018, at 12:45 p.m., (Call #4549), TARANGO used TT-24 to speak with her boyfriend Jason Oaks who intended to purchase some of the cocaine sent to Salazar-Felix by Tarango-Tarango. The conversation was as follows.

| Oaks: | "I should be good to go probably Monday. Maybe Sunday? Yeah. " |
| --- | --- |
| Tarango: | "Tomorrow? Let me check then . . . Let me see because this fool is ready. This guy was ready last week but . . . So, should I call him today?" |
| Oaks: | "No call him tomorrow . . . he should be ready to go . . . I'll text him tonight and tell them what's up for tomorrow." |
| Tarango: | "You want to work today? Tonight?" |
| Oaks: | "No tomorrow." |

| | |
|---|---|
| Tarango: | "Yeah, I already texted him and he say that's fine. Like, around three maybe?" |
| Oaks: | "Ask him what number it would be just on two of them." |
| Tarango: | "We can go check too, if you want to. And I think with the friend they're gonna be the same price as him." |
| Oaks: | "Twenty six?" |
| Tarango: | "Five. With my cousin. But I don't know with this other dude. I'm gonna try the two, with the number?" |

32. On March 3, 2018, at 7:44 p.m., TARANGO placed an outgoing call (Call #1191) on TT-23 to Eduardo Tarango-Tarango using Mexico based phone number (639) 117-6489. Tarango-Tarango explained he spoke with the source from Juarez and the source would have the courier "put plates on the car" either on Monday or Tuesday so the courier could travel. Tarango-Tarango asked "do you want at least one" kilogram of cocaine. TARANGO asked "how much?" Tarango-Tarango replied the price was the same. Tarango-Tarango said he would call the guy tomorrow and have him meet TARANGO wherever she wanted. Tarango-Tarango said she wanted to meet "at the office that I go to." Tarango-Tarango added that the courier "will do the same thing and arrive there with Oli" (Salazar-Felix).

33. A short while later, at 8:10 p.m., TARANGO placed an outgoing call (Call #1194) on TT-23 to Salazar-Felix using (720) 602-3142. During the call, TARANGO advised she and Jason Oaks wanted to purchase two kilograms of cocaine the next day. The conversation was as follows.

| | |
|---|---|
| Salazar: | "Look, in the morning, I'm going to stop by the milk store to get a gallon of milk . . . And I'll wait for you at three o'clock. I'm ready!" |

14

| | |
|---|---|
| Tarango: | "But it has to be for sure. Well, ask at the milk store if it could be done like with the guy . . . If it was the same, it could be two. But it depends on him. If he agrees." |
| Salazar: | "Okay. I'll talk to him. Let's meet at 3:00 to eat . . . If it falls into place, great. It can be two. But either way, I will let you know beforehand." |

34. On March 4, 2018, at 1:27 p.m., TARANGO spoke with Salazar-Felix who instructed TARANGO to come over to his house at exactly 4:00 p.m., to get the cocaine.

35. At 3:30 p.m., surveillance was established at Salazar's residence at 1620 Orchard Drive. At 4:12 p.m., surveillance saw Jason Oaks arrive in a maroon Toyota Tundra and park in front of 1620 Orchard Drive. At the same time, TARANGO arrived driving her red Jeep and parked across the street, called Salazar-Felix and said she was outside his house (Call #4882). Salazar-Felix explained he wasn't at the house adding "my friend told me he is going to take a while . . . his truck broke but he is on his way from Colorado Springs and he is going to take a while." Salazar-Felix asked "Is it going to be a tire or two tires?" TARANGO replied she wanted to get two kilograms but it depended on the price. Salazar-Felix replied it was $25,500 for each.

36. At 4:17 p.m., (Call #4883) Salazar-Felix called TARANGO and explained that the delivery was delayed to the following day and the two agreed to meet at 11:00 a.m. to complete the transaction.

37. On March 5, 2018, at 9:10 a.m., surveillance at Salazar-Felix's residence observed a suspected source of supply drop off drugs. At 11:11 a.m., investigators saw Oaks arrive at Salazar-Felix's residence 1620 Orchard Drive driving his maroon Toyota Tundra. TARANGO also arrived driving her red Jeep Wrangler. TARANGO parked on

the north side of Orchard Drive. Oaks parked on the south side of the street in front of the residence. Investigators watched Oaks remove a blue bag from the passenger side of his truck and climb into the truck bed. TARANGO walked to the front door while Oaks retrieved a white bag from the truck bed and appeared to take items out of the white bag and put the items into the blue bag. Oaks got out of the truck-bed and carried the blue bag to Salazar-Felix's front door. Investigators believe Oaks took money out of the white bag, put it in blue bag, and took the money inside to pay for the cocaine.

38.   At 11:35 a.m., TARANGO and Jason Oaks exited the front door of Salazar-Felix's residence and walked toward their respective vehicles. Oaks carried the blue bag and walked to the passenger side of the Toyota Tundra while TARANGO walked across the street to her Jeep. Investigators saw Oaks taking something out of the blue bag and placing the item in the Tundra's passenger seat. Oaks then took the blue bag, walked across the street to TARANGO's Jeep, gave her the blue bag, and went back to his vehicle empty-handed. TARANGO drove away, Oaks returned to his Tundra, and Oaks left the area.

## STIPULATION OF RELEVANT SENTENCING FACTORS

39.   The parties understand that the imposition of a sentence in this matter is governed by Title 18, United States Code, § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the

United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

    (a)    The parties stipulate and agree that, under § 2D1.1, the Base Offense Level is 32 because the quantity of drugs reasonably foreseeable to the defendant is at least 15 kilograms but less than 50 kilograms of a mixture or substance containing a detectable amount of cocaine.

    (b)    Under Section 2D1.1(b)(18) and Section 5C1.2, the defendant should receive a 2-level reduction for safety-valve. The adjusted offense level is 30.

    (c)    The defendant should receive a 3-level reduction for acceptance of responsibility under § 3E1.1(b). The adjusted offense level is 27.

    (d)    The defendant is believed to be in Criminal History Category I.

    (e)    The resulting sentencing guideline range for offense level 27, Criminal History Category I is 70-87 months. In an effort to be as accurate as possible, the sentencing range could potentially be as low as 70 months (bottom of offense level 27, Criminal History Category I) to a high of 162 months (top of offense level 27, Criminal History Category VI).

    (f)    There is a guideline fine range of $25,000 to $250,000. There is a statutory fine range of $10,000,000.

### REASONS WHY THE PLEA AGREEMENT IS APPROPRIATE

40. The plea encompasses all relevant conduct and adequately reflects the serious nature of the criminal activity engaged in by the defendant.

41. The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the Government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances." This agreement, to become effective, must be signed by all of the parties listed below.

17

signature block

Date: 11/14/19        _____
                      Aide Paola-Tarango, Defendant

Date: 11/14/19        _____
                      Alaurice Tafoya-Modi, Esq., Counsel to the Defendant

Date: 11/19/19        _____
                      Stephanie Podolak, Assistant U.S. Attorney

Date: 11/14/19        _____
                      Aide Paola-Tarango, Defendant

Date: 11/14/19        _____
                      Alaurice Tafoya-Modi, Esq., Counsel to the Defendant

Date: 11/19/19        _____
                      Stephanie Podolak, Assistant U.S. Attorney